GEORGINA LUISA LÓKPEZ FINLAY, Plaintiff, Cross-Defendant and Appellee, *v.* VÍCTOR LUIS LÓKPEZ ET AL., Defendants; HEIRS OF AMELIA PALMIERI, Counterclaimants and Appellants.

No. 8520. Argued Novermber 17, 1942.—Decided March 25, 1943.
Rehearing denied April 27, 1943.

*Damián Monserrat, Jr., Gabriel de la Haba*, and *Rafael Baragaño* for appellants. *Mariano Acosta Velarde, Federico Acosta Velarde*, and *Daniel Pellón, Jr.*, for appellee.

Mr. Justice Todd, Jr. delivered the opinion of the court.

Georgina Luisa Lókpez Finlay was emancipated by her father Víctor Lókpez by public deed executed before Notary Rafael A. Saliva, of Mayagüez, on July 25, 1935, and on that same day and before the same notary, she executed another deed granting a general power of attorney in favor of her father and authorizing him, among other things: " . . . to sell and convey in the name and in behalf of the grantor all kinds of real and personal property belonging to the grantor, and all kinds of real and personal rights of the grantor; to make the conveyance and sales which he may enter into by public deed upon such terms and conditions as he may think fit; to acquire for the grantor all kinds of real property, personal property, real and personal rights, upon such terms and conditions that he shall think fit; *to enter into all kinds of contracts, mortgages, submortgages, and the exchange of all kinds of real property, personal property, real*

and personal rights belonging to the grantor, partially or totally, as well as the submortgages; . . ." " . . . and to sign promissory notes, checks, and all kinds of documents in behalf of the grantor; . . ." (Italics ours.)

By virtue of said power of attorney, Víctor Lókpez borrowed from Mrs. Amelia Palmieri, widow of Woods, on May 22, 1937, the sum of $6,000 and executed a deed to secure said debt by mortgaging an estate belonging to his daughter. On July 13, 1938, plaintiff revoked the power of attorney which she had granted to her father, and shortly afterwards, filed this action in the lower court praying that the deed of mortgage be declared null and alleging, among other grounds, that her father did not have *patria potestas* over her and could not emancipate her; that assuming her emancipation to be valid, the power of attorney granted to her father did not authorize him to borrow money. Defendants denied these facts and as their chief defense they alleged that in any event plaintiff had ratified the contract and had benefited from the loan, codefendant heirs of Mrs. Amelia Palmieri praying that should the nullity action be successful plaintiff be ordered to return said sum.

The lower court sustained the complaint and the defendant heirs appealed from the judgment and in this appeal they allege that the lower court committed error, 1, in deciding that the attorney in fact lacked power to do the acts which plaintiff attacks and in consequence thereof that he could not borrow money and enter into the mortgage contract; 2, in deciding that the testimony given by witnesses Nathaniel Pasarell and María Amelia Pasarell, which tended to show that the contract had been ratified, was impertinent; 3, in deciding that no ratification took place, and; 4, in deciding that the mortgage contract is void and nonexistent.

Since all matters relating to the application of §9 of the Civil Code to plaintiff, to the exercise of *patria potestas* of her father over her, to her emancipation and to the grant-

ing of the power of attorney, were decided by the lower court in favor of defendants, appellants, as is natural, abstained from discussing those matters in their brief because they were not in controversy in this appeal. This notwithstanding, plaintiff-appellee in her brief, after answering the above-mentioned errors, discusses them fully for which reason appellants filed a reply brief in support of the lower court's conclusion. We are of the opinion that these matters were correctly decided by said court. To this effect, see *Lókpez* v. *Fernández,* decided on March 10, 1943, *ante,* p. 503.

We proceed to consider and decide the errors assigned in the instant case.

■■ The first error requires the determination of whether or not the power of attorney granted by plaintiff in favor of her father included the power to borrow money in behalf of plaintiff and to secure the debt with a mortgage.

From a mere reading of the pertinent part of the power of attorney hereinbefore transcribed, it will be seen that in spite of the fact that the same is a general power of attorney it contains no express authorization for the borrowing of money. Since the year 1909 this court has held consistently that agencies should be strictly construed, following the doctrine set forth by the Supreme Court of Spain and the interpretation given by the commentators of the Civil Code. Beginning with the case of *Fano* v. *Registrar of Property,* 15 P.R.R. 313, decided in that year and ending with that of *Font* v. *Registrar of Property,* 57 P.R.R. 635, decided in the year 1940, the doctrine of strict construction has been ratified in many decisions, some of which are cited in the *Font* case, *supra.* The decision in the case of *Villar* v. *Registrar of Property,* 17 P.R.R. 412, ratified in *Iturrondo* v. *Registrar of Property,* 17 P.R.R. 414, and in *Llull* v. *Registrar of Property,* 20 P.R.R. 412, is directly applicable to the case at bar.

In the *Villar* case, *supra,* it was held that the power to borrow money must be given expressly by the principal, even when the power of attorney involved in that case granted the power to mortgage and sell. This court, in an opinion delivered by its then Associate Justice Del Toro, stated as follows:

"The authority to borrow money does not appear as having been expressly conferred, but the appellant alleges that such authority was to be implied because the principal empowers his agent not only to mortgage all his property, rights, credits, and actions, but likewise to sell, exchange, and assign them.

"If the authority conferred upon agencies were amply and liberally construed, the appellant perhaps would be in the right; but as in accordance with the natural law, equity, jurisprudence, and the Civil Code itself, agencies should be construed in a restrictive sense; in the case at bar the registrar is in the right.

"　　*　　　*　　　*　　　*　　　*　　　*　　　*

"To borrow money is a serious matter, and a person may be perfectly willing to authorize his agent to sell or mortgage for the purpose of paying existing debts, etc., but not to authorize him to contract loans. The powers of agents should be clear and distinct, and the authority to borrow money, where it is conferred, should be expressly set forth in the public instrument executed to that effect."

It is true that in that case as well as in that of *Iturrondo, supra,* two justices dissented, but in that of *Llull* v. *Registrar of Property, supra,* the doctrine of the *Villar* case was ratified and the two justices who had previously dissented voted with the majority, and one of them, Mr. Justice Wolf, delivering the opinion of the court, stated:

"Even if the words of the fourth clause should have referred to money borrowed by the attorney in fact, as the appellant maintains, the ruling of this court in *Villar* v. *Registrar of Property,* 17 P.R.R. 412, would have to prevail, namely, that in the absence of an express authority the power to mortgage did not include the power to borrow money. However, the fourth clause is ambiguous and the note of the registrar must be affirmed."

Appellants argue that in the case of *Diez* v. *Green et al.*, 32 P.R.R. 749, 752, this court modified the doctrine of the *Villar* case, *supra*, "establishing that when the power to mortgage and the power to issue promissory notes is granted, money may be borrowed." Appellants' contention is incorrect, because the decision in *Diez* v. *Green, supra,* does not have the scope which they try to give to it. What this court held was that in granting to his agent the power to sign promissory notes, Diez had authorized him to acknowledge a debt already contracted by his principal and that therefore, a mortgage executed by Pérez in favor of Green to secure said debt was not void. After making reference to the powers contained in the power of attorney, this court said:

"The said powers conferred upon the attorney in fact show that Antonio Diez not only gave José B. Pérez full and general authority to act in his name, but expressly gave him authority to create mortgages, to execute in public instruments such contracts as he might make and to sign promissory notes, which are documents in which debts are acknowledged; therefore, we can not declare null and void the deed of June 1, 1914, in which the attorney in fact created a mortgage on a property belonging to his principal to secure to Green the payment of the $5,000 acknowledged by the attorney in fact to be owing to Green by his principal."

If the attorney in fact in the case at bar had limited himself to acknowledging the existence of a debt contracted by his principal, the doctrine of the case of *Diez* v. *Green, supra,* would be applicable, since the power of attorney involved in both cases granted to the attorney in fact the power to mortgage property belonging to his principal and to sign promissory notes. But the contract entered into by the attorney in fact in this case was entirely different, that is to say, he borrowed money on behalf of his principal without there existing any debt whatsoever, and therefore, the doctrine of the cited case is inapplicable.

Appellants also cite the case of *Dapena* v. *Estate of Dominicci*, 12 P.R.R. 64. They are correct when they argue

that that case contradicts the previously stated doctrine and supports their position. In spite of the fact that the power of attorney in that case only granted power to administer, direct, and manage the property of the principal, this court, in an opinion delivered by Mr. Justice MacLeary, held the following:

"While the borrowing of money, and the making of a promissory note to secure the same, or the purchase of goods and incurring indebtedness, and settling the same by promissory note, is not specifically mentioned, still the power to do so is necessarily included in the management and general administration of the properties, and the attorney in fact, under the authority granted, could incur the indebtedness and make the note. We regard the power of attorney as sufficient to authorize the attorney in fact to make, execute and deliver the promissory note sued upon."

The opinion does not contain any citation whatsoever to sustain the conclusion reached by the court. Apparently the exception prevailing at common law to the effect that he may do so " . . . unless the character of the business or the duties of the agent are such in nature as to render it reasonably requisite for him to borrow or lend in order to carry out the instructions and the duties of his office, . . . " 2 C. J.S., Agency, §2, was applied. We say that this is the exception because the general rule in the United States is the same as in this jurisdiction. As was said in the case of *Williams* v. *Dugan*, 105 N. E. 615, 217 Mass. 526:

"The power to borrow money or to execute and deliver promissory notes is one of the most important which a principal can confer upon an agent. It is fraught with great possibilities of financial calamity. It is not lightly to be implied. It either must be granted by express terms or flow as a necessary and inevitable consequence from the nature of the agency actually created."

In the Restatement of Agency, §74, the rule is stated as follows: "Unless otherwise agreed, an agent is not authorized to borrow unless such borrowing is usually incident to

the performance of acts which he is authorized to perform for the principal.''

The case of *Dapena* v. *Dominicci* was decided prior to those of *Villar* v. *Registrar of Property; Iturrondo* v. *Registrar of Property;* and *Llull* v. *Registrar of Property,* ratified in *Font* v. *Registrar of Property, supra,* and in so far as it is in conflict with the rule of strict construction of agencies therein contained, should be considered revoked.

■ Lastly, appellants contend that if the power of attorney did not grant to Lókpez the power to borrow money, plaintiff gave him power to do so in several letters which she wrote to her father after the granting of the power of attorney. We have carefully read those letters several times (Exhibit "J" for defendants) and we agree with the analysis made of them by the lower court in its opinion:

". . . In none of the cited letters is Mr. Lókpez given power to borrow money. In the first one dated February 19, 1937, plaintiff tells her father among other things: 'In the first place the $10,000 which you will send me will be put in my name.' 'Start getting the money thogether for the divorce here because I have to give the attorneys something in advance.' 'I will need about $500.' 'If you were to get $10,000 and come and live with me, that would be divine.' 'As I told you in my last letter I received the $300 and I sent him $200.'

"The second letter dated February 23, 1937, contains the following phrases: 'I want to ask you how long you will take to get me that money.' 'You know that most of what you send, I send to Pedrito.' 'Father, try to send me a draft for about $500 as soon as you can, this time I will not send it to him.' 'Remember, as soon as you get this letter send me a draft for what you can get.'

"The third letter dated February 26, 1937, states as follows: 'I asked you to send me money for the lawyers here.' 'You only send me small amounts of money and that goes like water for the simple reason that he being over there and I over here, we are in need of money.' 'About that business I will let you know when I have the money and we are about ready to get started.'

"And in the last letter dated March 4, 1937, plaintiff wrote to her father: 'I have just sent you another cable asking for more

money.' 'If you had sent me the $10,000 everything would be ready and I would leave and with $8,000 I would start a business there, but I trust in you and I hope you will send it soon so that Pedrito will be able to begin working.' 'I beg you to do all you can to send me that money in order to begin working.'

"We have analyzed and read carefully each of the cited letters and after doing so we are convinced that no reference whatsoever is made in them to the borrowing of money. They are all letters sent to a father by a daughter brought up as a rich girl, pleased in all her whims and never contradicted, as is shown by the letters themselves, from which it appears that the father consented and allowed his daughter to take steps toward getting a divorce for the man who is today her husband, paying for counsel and giving money to the woman who was then his wife, and he was going to get the sum of $10,000 for his daughter in order that her husband might start a business. There is no evidence that the cited letters were ever shown to defendant, Mrs. Palmieri, widow of Woods, in order to obtain the loan from her.

"Plaintiff's Exhibit 8, which is a statement of account, corroborates our conclusion as to how spoiled plaintiff was. It shows that from January 18, 1937, until May 20, of that same year, two days before the loan mas made, Mr. Lókpez had given his daughter, the plaintiff, $4,160, more than $1,000 every month."

The fact that plaintiff asked her father to send her $10,000 in order to start a business and to pay the expenses of the divorce for her future husband can not be interpreted as implied authority to the father to borrow said sum. Plaintiff's acts are compatible with the power which plaintiff's father already had to sell any one of her properties, as he in fact did, as was shown by Plaintiff's Exhibit 7, wherein the property sold by virtue of the power of attorney and for the total sum of $47,074.11, are specified. The sum of $5,816.60, out of this total amount, corresponds to lots sold from February 26 to May 11, 1937, that is, before the mortgage involved in this case was executed on May 22. It may not be held that plaintiff's father was impliedly empowered to borrow the $6,000 when the facts proved show that he

was exercising the express power granted to him to sell property. The first error was not committed.

■■ The second and third errors may be discussed and decided jointly, since they refer to the refusal of the lower court to admit certain evidence offered by defendants in support of their defense that the contract of loan and mortgage was ratified by plaintiff, and to the court's decision to the effect that there was no such ratification.

The sixth paragraph of the new matter pleaded in defendants' answer states: "that plaintiff has ratified both the mortgage deed attacked in the complaint and all the contracts entered into by her father by virtue of said emancipation and general power of attorney by acts subsequent to said emancipation and granting of general power of attorney . . ." With reference to this paragraph plaintiff prayed and obtained a bill of particulars which reads, in part, as follows:

"Plaintiff has ratified the mortgage deed as well as all the other acts of her father:

"(a) By asking defendant, through the undersigned attorney, and defendant's son Nathaniel Pasarell, for the partial cancellation of said mortgage with reference to a lot which formed part of the mortgaged estate in order to sell it to a third person free from said encumbrance."

Was the ratification proved? Defendants insistently tried to introduce evidence to that effect by offering the testimony of Nathaniel Pasarell and María Amelia Pasarell. Plaintiff objected and the court refused to admit it, defendants noting an exception.

Two incidents appear in the transcript of the evidence in relation to this testimony. The first took place when witness Nathaniel Pasarell, son of Mrs. Amelia Palmieri, the first mortgagor, was testifying. He was asked: "What offers of payment, if any, were made to Mrs. Amelia Palmieri through you in relation to this mortgage loan?" A long incident then took place, in which plaintiff's attorney objected

to the question on the ground that the attorney for defendants having stated that it was plainiff's husband who acted, "plaintiff has already stated here that she never authorized anyone," and that the property being her separate property, the acts of her husband could not bind her. Defendants' argument was to the effect that the husband being the administrator of the community property and that he being liable, according to §1308 of the Civil Code, for "the arrears of interest, matured during the marriage, on obligations which affect the private property of the spouses as well as the partnership property," the evidence was admissible to show the steps taken by plaintiff's husband, Mr. Rovira, in her behalf for the payment of the interest on the mortgage and to obtain the mortgagor's consent for the sale of the mortgaged lots free from the encumbrance, the mortgagor to receive one-third of the purchase price.

We are of the opinion that the lower court erred in not admitting this evidence, especially if we take into consideration the testimony of plaintiff, her husband, and the collector, Mr. Peña.

Rebutting in advance defendants' defense, plaintiff tried to weaken the probative force of any act on her part which might imply a ratification of the loan. She as well as her husband, denied that he or the collector, Mr. Peña, had been empowered by plaintiff to pay the interest which Peña paid in her name to the mortgagor in the month of May 1938, and they also denied that plaintiff had empowered her husband to try to sell the lots subject to the mortgage with the consent of the mortgagor. However, all these denials loose strength when faced with the acts of the plaintiff and her husband, according to their own testimony corroborated by that of Peña.

Plaintiff testified that in the month of May 1938, she took charge of her property and that Peña, who had been hired by her father, continued to be her collector. That from said

month of May, Peña settled her accounts with her husband; that she did not remember the sum handed over to him; that she knew about the mortgage; that her husband raised the rent on his own account without her having authorized him to do so; that her husband paid the taxes and also went to see Peña to collect the rents and later gave that money to her; *that she took no part in the administration of her property;* that her husband collected, *"but that she had to sign all deeds for lots that were sold";* that when lots were sold, the interested party discussed the purchase price with her and her husband. Plaintiff specifically denied that she or her husband tried to sell the lots mortgaged to Mrs. Palmieri, or that she empowered her husband to try to sell them.

Plaintiff's husband, Mr. Rovira, testified that he received his wife's rents; that he learned that Peña had paid the interest on the mortgage for the month of May 1938 and that he told him that he should not have made that payment and to refrain from doing so in the future; *that he did not inform his wife of that payment;* that Peña collected about $400 in May and that after deducting his commission and the $40 interest, there remained about $320, and that he delivered part of it to his wife and *retained part of it* and told her: "Here you have the rents collected for this month. *This is what remains";* that she demanded no explanation and that he did not inform her of the payment of the interest; that he had not been empowered by his wife but that "that is an interest which a husband takes in his wife's property"; that she had full confidence in him and continued to have it because he is "the one who should face those problems." (Italics ours.)

Apparently troubled by Mr. Rovira's testimony, the trial judge asked him: "And in spite of all your protests to Mr. Peña, you did not inform your wife of what had happened?" The witness answered in the negative, with the explanation that she knew nothing about it and that as the matter was

being studied, she told him that the interest should not be paid. Peña corroborated in full plaintiff's testimony, as well as that of her husband, to the effect that it was Mr. Rovira who dealt every month with him in the settlement of plaintiff's rents; that he paid the interest for the month of May to Mrs. Palmieri, and that Rovira told him that he should not have done so; that he never dealt directly with plaintiff; that Rovira raised the rent; that when plaintiff and Rovira left for New York, he sent the money by drafts to Rovira.

All this evidence shows that the administrator of plaintiff's separate property was her husband, Mr. Rovira. It is true that she as well as he testified that he had received no authorization from her. However, what is the value of this testimony, in view of Rovira's acts admitted by plaintiff as well as her husband, and corroborated by Peña? It was proved, in fact, that although plaintiff may not have expressly empowered her husband to *sell* her property, she entrusted to him the administration of her separate property, including the taking of steps for the sale of lots although "with regard to deeds it was she who had to sign." It was he who received the rents and delivered part of them to the plaintiff, retaining another part; it was he who fixed the rentals and who paid the taxes and who dealt with the collector, Mr. Peña, plaintiff acquiescing therein. If all this was proved by plaintiff's evidence, under what legal theory can it be held that the evidence for defendants which tended to show other acts of Rovira, in behalf of his wife, was not admissible? We do not state or decide what weight or credit his evidence should have been given by the trial judge, but we do hold that it was clearly admissible to contradict the evidence for the plaintiff which tended to deny the authority under which her husband acted and to sustain the defense of ratification alleged by defendants. If for the sale of the separate real property of plaintiff Rovira needed express authorization from his wife, for the steps taken for

the sale of the lots, payment of interest, and other similar acts of administration, the authorization proved to have been tacitly given was enough. Sections 1601 to 1604 of the Civil Code. Whether the taking of these steps with the knowledge and approval of the plaintiff resulted in her ratification of the contract of loan, is a matter which may be decided only after hearing the evidence which was excluded, keeping in mind §1618 of the Civil Code, especially its second paragraph which provides that: "A principal is liable, in so far as the agent has exceeded his power, only when he ratifies the same, *expressly or in an implied manner.*" (Italics ours.)

Manresa, in his commentaries on the second paragraph of §1727 of the Spanish Civil Code, equivalent to §1618 of our Code, states in vol. 11, pp. 536, 537, of his work:

"It is enough to state here that this legal precept is in accordance, as to this point, with the most strict rules of justice and that, in the legal and historical evolution the *ratihabitio* was always considered a faculty inherent in the principal. *Both the express and the tacit ratifications, with regard to their effects, are in law equally matched,* because it means nothing but the giving of consent and the manifestation of the will, *sometimes by the spoken word, the expression of thought, sometimes by acts arising out of deliberation and volition.*" (Italics ours.)

Duly matched in their effects, both the express and the tacit ratifications must be proved by he who alleges the same and plaintiff having tried to deny said ratification in advance by means of her evidence, the lower court erred in not admitting defendants' evidence which was essential in order to decide whether or not there was a ratification, especially a tacit one. Defendants' evidence having shown certain acts done by Mr. Rovira, the last part of §385 of the Code of Civil Procedure (§23 Law of Evidence), is applicable: " . . . when a detached act, declaration, conversation, or writing is given in evidence, any *other* act, declaration, conversation, or writing which is necessary to make it wholly understood, may also be given in evidence."

The situation presented by the case at bar is one which requires the determination of two questions, 1, whether or not plaintiff granted to her husband tacit power to administer her separate property and 2, whether or not, in acting as agent for his wife, the husband ratified, with the express or tacit knowledge and consent of plaintiff, the debt which she owed defendant. As to the first question, we have already decided that plaintiff's own evidence showed that she granted said power to her husband. We can not decide the second question because we do not have before us the evidence which was rejected by the lower court. It was not a question of defendants proving, as the lower court erroneously thought, acts of Mr. Rovira as administrator of the community property, but his acts as administrator of plaintiff's separate property, a fact which, as we have said, was clearly demonstrated.

We are of the opinion that the second error was committed and that it makes necessary the reversal of the judgment.

The appeal is sustained, the judgment appealed from is reversed, and the case is remanded to the lower court for further proceedings not inconsistent with this opinion.

### ON MOTION FOR REHEARING

### ORDER

April 27, 1943.

By the Court, at the suggestion of Mr. Justice Todd, Jr.

The motion for rehearing filed by the appellee is based, first, on the inapplicability to the facts of this case of the doctrine of domicile; second, that should it be applicable, plaintiff was a minor at the time of the alleged act of ratification and being domiciled in New York, could not ratify it; third, that the error in not admitting the evidence which tended to show the ratification is not prejudicial because plaintiff, being a minor, could not ratify the mortgage con-

tract without the consent of her father; and fourth, because said contract being null, in the sense that it is nonexistent, could not be ratified.

WHEREAS, the first ground, as we said in our former opinion, was not the subject of an assignment of error in this appeal and we only refered to what was decided in the case of *Lókpez v. Fernández, ante*, p. 503;

WHEREAS, we are not in a position to decide the second, third, and fourth grounds relied on, because the evidence excluded in respect to the testimony of Mr. Nathaniel Pasarell did not refer solely to a date previous to that on which plaintiff became of age, but in general terms referred to whether or not plaintiff "at any time" asked Mr. Pasarell to authorize her to sell the mortgaged lots (Tr. of Ev., pp. 127, 190, and 191) and those matters, therefore, should be decided by the lower court in accordance with the legal effect of the evidence to be admitted and the facts which it deems proved in relation to the ratification, and also whether or not the contract, in accordance with that evidence, could be ratified;

THEREFORE, the motion for rehearing is overruled.